UNITED STATES of America, Plaintiff-Appellant,

v.

Jason R. BERVALDI, Defendant-Appellee.

Nos. 98-5419, 98-5547.

United States Court of Appeals,

Eleventh Circuit.

Sept. 14, 2000.

Appeals from the United States District Court for the Southern District of Florida. (No.98-00183-CR-DLG), Donald L Graham, Judge.

Before ANDERSON, Chief Judge, and CARNES and OAKES[*], Circuit Judges.

ANDERSON, Chief Judge:

In this interlocutory appeal, the United States challenges the district court's suppression of statements made by Jason Bervaldi and of physical evidence seized from his residence. This appeal presents two questions: whether the law enforcement agents who arrested Bervaldi and seized the evidence had a reasonable belief at the time of entering his residence that it was the dwelling of the subject of an arrest warrant they were attempting to execute; and whether they had a reasonable belief that this subject would be present there. For the reasons stated below, we conclude that they did have such reasonable beliefs and, accordingly, reverse and remand.

## I. BACKGROUND

At approximately 6:00 am on March 10, 1998, Officers Wilfredo Abascal and Rafael Masferrer and several other officers approached the house at 3621 S.W. 129th Avenue ("129th Avenue"), in Miami, Florida, to execute an arrest warrant for Bennett Deridder. The officers observed two trucks and a boat trailer parked in the driveway. The officers were wearing raid jackets featuring the word "police" on the front and back. The sky was dark and a single exterior light shone about two feet from the front door.

Officer Abascal knocked hard on the front door for about ten minutes without response. As the

[*]Honorable James L. Oakes, U.S. Circuit Judge for the Second Circuit, sitting by designation

officers were turning away to check the license tags on the parked vehicles, the front door opened about one foot. Officer Abascal observed the left side of a barefoot, bare-chested man standing at the door wearing shorts, but could not, given the lighting, clearly see the man's features. Officer Abascal observed, however, that the man had the same height, stocky build, and complexion as Deridder,[1] and that the hair on the man's head was shaved while Deridder had last been observed with a full head of hair. Officer Abascal also observed that the man's left hand was behind his back and thought that he might be armed.

Officer Abascal announced that they were police. The man slammed the door shut. The officers kicked the door down, entered the house, and caught the man within ten to twenty feet of the entrance. A cocked, but unloaded 9 millimeter pistol was found resting on a gym bag ten feet to the right of the door. Officers Abascal and Masferrer quickly realized that the man that they held was not Deridder. The officers performed a protective sweep of the house believing that Deridder or others might be in the house. During this sweep, the officers noticed a very strong smell of marijuana coming from the kitchen.

The officers discovered that the apprehended man was Jason Bervaldi. After Bervaldi was advised of his *Miranda* rights and indicated he understood, the officers asked him whether marijuana was in the house. Bervaldi showed the officers marijuana stored in the kitchen cupboard. Bervaldi orally consented to a search, but would not sign a written consent form. The officers did not immediately search beyond the initial protective sweep. Instead, some officers went to get a search warrant. When they returned with a search warrant around 5:00 p.m., a search was conducted that resulted in the discovery and seizure of 60 pounds of marijuana stored in kitchen cupboards, 17 sealed baggies of marijuana, 1 kilogram of cocaine, 3 bags of cocaine cutting agent, 1 Ohaus digital scale, 1 Nexus scale, 1 cellular phone ESN reader, various cellular phones and accessories, 1 Cobray MAC-119 mm semiautomatic pistol, 1 Browning rifle with ammunition, $53,483 in U.S. currency, 1 1998 Ford pickup truck, 1 1997 Contender boat, 1 jet ski, 1 motorcycle, 1 Rolex watch, 1 large machine press, and 1 wooden mold. Although Bervaldi was kept in custody throughout the day at his residence, he was not formally arrested until later that evening.

---

[1]Abascal had seen Deridder the previous June, when he and another officer had a brief conversation with him at a food stop. *See infra.*

On March 20, 1998, a federal grand jury sitting in Miami, Florida, returned a three-count indictment charging Bervaldi with knowingly possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), knowingly possessing marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and knowingly and intentionally possessing and receiving a firearm which had the importer and manufacturer's serial number removed, obliterated, and altered, in violation of 18 U.S.C. § 922(k). On May 1, 1998, Bervaldi filed motions to suppress his statements and the physical evidence seized on March 10, 1998, on Fourth Amendment grounds.

On July 2 and 15, a magistrate judge conducted an evidentiary hearing on the motions. At this hearing, Daniel Mahoney, a special agent with the Drug Enforcement Administration ("DEA"), testified that Bennett Deridder was identified in June 1997 as a person involved in a drug operation based on telephone calls intercepted by lawful wire taps. Mahoney indicated that Officers Abascal and Masferrer assisted in identifying Deridder's residence. In particular, these officers identified a vehicle that Deridder was driving based on a traffic citation and determined that that vehicle, a red Chevy truck, was registered to 3621 S.W. 129th Avenue in the name of Betty Spatten. Mahoney further explained that on June 27, 1997, these two officers observed the vehicle leaving this residence, followed the vehicle, and then spoke with the driver, Deridder.

Abascal testified that on June 27, 1997, he and Masferrer attempted to get a voice identification on Deridder to link the wiretap evidence to Deridder. Consistent with Mahoney's explanation, Abascal explained that they sought Deridder at the 129th Avenue address after checking Metro-Dade computer records for traffic tickets which revealed that on June 4, 1997, Deridder had received a traffic citation while driving a red pickup Chevy truck with tag number VAW56Y. Although the traffic citation record listed 4406 S.W. 132nd Place ("132nd Place") as Deridder's address, they discovered that this truck was registered in Betty Spatten's name to the 129th Avenue address. On June 27, 1998, they observed Deridder come out of 3621 S.W. 129th Avenue residence, get in the same red pickup truck, and drive to a "food stop." When Deridder stopped at the food stop, Abascal and Masferrer approached him, identified themselves, and had a brief conversation

with him.  Abascal asked Deridder where he lived.  Deridder provided the 129th Avenue address and what he identified as his parents' address, the 132nd Place address.  Abascal explained that Deridder provided two addresses, "one for his parents, and one for his residence."

Masferrer's testimony was consistent with Abascal's testimony.  Masferrer also reported that Deridder gave the 129th Avenue address as his residence and the 132nd Place address as his parents' address.[2]

---

[2]To make the distinction clear, on redirect examination of Abascal, the Government elicited the following:

> Q. Did he give you the address for his parents' house before or after you asked to see his driver's license?
>
> A. He confirmed that his parents lived at the address that was on the face of his driver's license, and that he lived at 3621 129th Avenue address.
>
> Q. Now, in your mind was he making a distinction between what was on his driver's license and where he was telling you he lived?
>
> A. Absolutely.
>
> Q. And in your mind, where was he telling you that he lived, referring to Bennett Deridder?
>
> A. 3621 Southwest 129th Avenue.

On direct examination of Masferrer concerning the June 27th interview with Deridder, the Government elicited the following:

> Q. What kind of identification did you get from Deridder?
>
> A. I got his driver's license, and I asked him where he lives.  He gave me the address. That address 129th and the address of his father and mother 132nd Avenue.
>
> Q. Which address is shown on his driver license?
>
> A. The one on 132nd Avenue.
>
> Q. You said he gave you the address, 129th Avenue address, what did he say about that address?
>
> A. That he lived there.  That was his house.  He lived there and his license, the address on his license was his mom's, his parent's house.
>
> Q. Did he give you anymore [sic] information at that time about where he was living?
>
> A. He was living on 129th Avenue.

At the hearing, the Government also adduced evidence concerning queries of computer systems. Mahoney testified that he used Autotrac, a compilation of several databases, ranging from highway safety to corporations and real estate, to acquire information on Deridder. On June 26, 1997, Mahoney ran the first Autotrac query on Bennett Deridder. The printout of this query, which was admitted into evidence, included the following:

Known Subject Addresses

-----------------------

DEC-85/MAR-97—4406 SW 132 PL, MIAMI FL 33175

Mahoney explained that this indicated that some type of information found in one of the databases contained in Autotrac linked Deridder to that address from December 1985 to March 1997. Mahoney also explained that the printout listed Phillip Deridder, Bennett Deridder's father, as a possible relative and listed 4406 SW 132 Place, Miami, as the father's address. The printout listed a 1991 WBON trailer, with a tag which expired in September 1992, as registered to 132nd Place in Bennett Deridder's name. The printout also listed Betty Spatten as a possible associated person. Her address was also listed as 132nd Place for various periods ending in September 1996. However, as noted above, the check of the vehicle in which Bennett Deridder was observed revealed that it was registered to Betty Spatten at the 129th Avenue address.

Mahoney also testified about a computer check of Flight Equipment, Inc., conducted on August 20, 1997. The printout of this check, which was admitted in evidence, included:

Historical Principles

---

Mahoney also testified that Deridder gave two addresses during the June 27th stop: the 132nd Place address and the 129th Avenue address. He did not explain if or how Deridder distinguished between them. However, he was not present at the stop. Only Abascal and Masferrer provided first-hand testimony about what Deridder told them about these addresses. As explained above, both unequivocally indicated that Deridder stated that he resided at the 129th Avenue address but that his parents resided at the 132nd Place address, which was on his license. The magistrate judge's report and recommendation indicates that Deridder told the officers that he lived at both addresses. The report and recommendation, however, does not distinguish between them as the officers did when they testified. To the extent the district court, by adopting this report and recommendation, failed to thus distinguish between these addresses, we find clear error. This error may explain the magistrate judge's apparent overemphasis on the 132nd Place address.

----------------------

....

Registered Agent—Status: Active

RIDDER BENNETT D 3621 S.W. 129th AVENUE (REAR) MIAMI FL 33175  Country: US

RIDDER, BENNETT D

MAY95/MAY-95—4406 SW 132ND PL MIAMI FL 33175 3621 SW 129TH AVE MIAMI FL 33175 832 E 21ST ST HIALEAH FL 33013

Director

DE RIDDER BENNETT 3621 S.W. 129th AVENUE (REAR) MIAMI FL 33175

DERIDDER, BENNETT DOB:  9/11/70 SS# :  [omitted] Was issued in Florida in 1986

DEC-85/APR-96—4406 SW 132 PL, MIAMI FL 33175

The printout also indicates that the previous address of Flight Equipment, Inc., was "3621 SW 129 AVE REAR MIAMI FL 33175."

Mahoney also testified about a second Autotrac check of Deridder conducted on February 4, 1998. The printout of this check, which was admitted into evidence, included:

Addresses Linked To Subject

--------------------------

JUN-97/JUN-97—3621 S.W. 129TH AVE (REAR), MIAMI FL 33175

JUN-97/JUN-97—832 EAST 21ST STREET, HIALEAH FL 33013

DEC-85/JUN-97—4406 SW 132 PL, MIAMI FL 33175

This printout also indicated that a 1995 homemade trailer, with a tag which expired in September 1998, was registered to the 132nd Place address in Bennett Deridder's name.  There was no information on this printout after June of 1997 showing any other address for Bennett Deridder.

Mahoney also described an Information America printout, a credit report, that was dated February 9, 1998.  For Deridder, it listed the 132nd Place address as well as some other addresses.  Likewise, driver's

license records and arrest records that Mahoney checked listed the 132nd Place as Deridder's address.

Mahoney testified that he gave the arresting officers the 129th Avenue address and the 132nd Place address for Deridder. He explained that he gave them the 129th Avenue address because it was "obvious" to the investigators that Deridder was only using his parents' address, 132nd Place, as a "straw address" for records and was actually residing elsewhere. The parents' address was provided because, if Deridder needed to be tracked down, speaking to his parents to seek his whereabouts would be part of the process.

Mahoney explained that the arrest warrant listed 132nd Place as Deridder's last known address because that is the permanent residence of his family, who would be contacted if Deridder needed to be located. He explained that 129th Avenue would be the first place to check for Deridder because it is where he resided.

Mahoney also testified that he observed a red Chevy pickup with tag VAW56Y at the 3621 S.W. 129th Avenue address on August 20, 1997. A check revealed that it was registered to Betty Spatten at that address.

Bervaldi adduced several pieces of evidence to show that Deridder did not reside at 129th Avenue on March 10, 1998. Brian McGuinness, a private investigator, testified about Autotrac. He explained that Autotrac is a "compilation of public record data that comes from a variety of sources" and that it is not always accurate. He also testified that Agent Mahoney could have run a "Dossier" search, which would have been more expansive than the searches Mahoney ran, but that there was "not very much" difference between these two types of searches. Bervaldi introduced into evidence a Dossier search of the 129th Avenue address, which indicated that Bervaldi registered a vehicle there in January 1998. Mahoney testified that he did not run a Dossier search because it generally does not have investigative value but instead just lists trails of information about every possible individual who lived at a residence.

Second, McGuinness testified about several records he acquired which indicated that Deridder moved from the 129th Avenue residence around the beginning of 1998. First, a warranty deed, dated February 17, 1998, which indicated that Marcella and Phillip Deridder sold the property to Jason Bervaldi, was recorded

in the public records on March 5, 1998. Florida Power & Light records, acquired by subpoena, indicated that Beatriz Ramos was a customer at the 129th Avenue address beginning on December 30, 1997, and Felipe Deridder was a customer from May 14, 1996, to December 30, 1997. Miami-Dade Water & Sewer records, also acquired by subpoena, indicated that service for the 129th Avenue address was in the name of Marcella Deridder from May 3, 1996, to January 5, 1998, and in the name of Beatriz Ramos starting on December 30, 1997. Likewise, BellSouth Telecommunication records, again acquired by subpoena, indicated that service to the 129th Avenue address was established by Ramos on January 5, 1998.[3]

Bervaldi also introduced the affidavit of Donald Brooks, a part-time carpenter, which indicated Brooks did some repair work on the 129th Avenue residence in the last part of January and early February of 1998 and that, to the best of Brooks' recollection, there was no for sale sign on the property at that time. Pedro Molina, a landscaper who provided service to the 129th Avenue address, testified that he observed a for sale sign in the summer and fall of 1997, but when he went to the address on December 22, he did not see the sign. Abascal testified that he saw a for sale sign in front of the house on June 27, 1997, and on the morning of March 10, 1998. Masferrer testified that he recalled seeing a for sale sign prior to March 10, 1998, but could not recall if he saw one that morning. Pictures taken of the house on March 10, 1998, do not show a for sale sign.[4]

On July 23, 1998, the magistrate issued a report and recommendation. In particular, the magistrate judge concluded that the officers could not have reasonably believed that Deridder resided at the 129th Avenue house on March 10, 1998, but that, had they reasonably believed that this was his residence, then they could have reasonably believed that Deridder was at the house when they entered it. The magistrate judge recommended that the motions to suppress be granted. On August 18, 1998, the district court adopted the magistrate judge's report and recommendation and granted the motions. The United States appeals.

_____

[3]Ramos is Bervaldi's long-time live-in girlfriend.

[4]We note that though the parties stipulated that Deridder did not actually reside at 129th Avenue on March 10, 1998, it ultimately became clear that he did not actually reside at 132nd Place either. In fact, Bervaldi led the officers to a Calusa Club Drive residence on March 10, 1998, where officers spoke with Deridder's girlfriend, who stated that he lived there with her.

## II. DISCUSSION

Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo. See United States v. Magluta,* 44 F.3d 1530, 1536 (11th Cir.1995). Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below. *See id.* The magistrate judge's conclusion that the police officers did not have reason to believe that the house was Deridder's residence, adopted in full by the district court, is a legal determination subject to *de novo* review. *See id.* at 1537 ("We therefore hold that the magistrate judge's conclusion that the marshals did not have reason to believe that Magluta was at home, was a legal determination and not a factual finding.").

Although searches and seizures inside a home without a search warrant are presumptively unreasonable, in *Payton v. New York,* 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), the Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." We have since held that *Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches. *See Magluta,* 44 F.3d at 1533. In particular, we have held that "first, there must be a reasonable belief that the location to be searched is the suspect's dwelling, and second, the police must have 'reason to believe' that the suspect is within the dwelling." *Id.* Elaborating on this inquiry, we have explained that "for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *Id.* at 1535. Furthermore, "in evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence." *Id.* We believe such "common sense factors" must also guide courts in evaluating the first *Payton* prong.

We examine first whether the officers had "a reasonable belief" that 129th Avenue was Deridder's dwelling when they entered on the morning of March 10, 1998. Despite the Autotrac reports and driver's license records indicating that Deridder's address was 132nd Place, there was strong evidence indicating that Deridder in reality resided at 129th Avenue. Both Officers Abascal and Masferrer observed Deridder leave the 129th Avenue residence and enter a red Chevy pickup truck on June 27, 1997. In addition, both officers unequivocally testified that when they interviewed Deridder on that day he indicated that he resided at 129th Avenue but that the address on his license, 132nd Place, was his parents' address. *See supra* n. 1. It is not unusual for persons of Deridder's age—the Autotrac report and driver's license records indicate he was twenty-seven at the time of the entry—to use their parents' address for records, such as driver's licenses, official mailing address, et cetera, because in a sense it may be a more permanent or fixed address than the address of their own residence. For example, oftentimes university students or law clerks in their twenties use their parents' address while studying or clerking. The officers and the courts are entitled to consider such a common sense factor. *See Magluta,* 44 F.3d at 1535. Moreover, even if the 132nd Place address was his "permanent residence" in some sense, that is not inconsistent with Deridder's residence at the 129th Avenue address. *See United States v. Risse,* 83 F.3d 212, 217 (8th Cir.1996) ("[W]e reject Risse's contention that, because the officers knew, or should have known, that Rhoads maintained a permanent residence on Knoll Street, they could not have reasonably believed that Rhoads resided on Huntington Road."). Nor is it significant that the arrest warrant listed the 132nd Place address. *See United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995) (rejecting argument that when police believe that the target of an arrest lives at an address other than the one listed on the warrant, they must apply for a new warrant before arresting the suspect at the new residence). The officers knew that Deridder used his parents' address as a "permanent address" although he actually resided elsewhere. In light of the officers' observation of Deridder at the 129th Avenue residence and his statements to them that he resided there and that the 132nd Place address was his parents' address, we readily conclude that the officers had a reasonable belief that Deridder resided at 129th Avenue on June 27, 1997.

However, this conclusion does not end the first inquiry required by *Payton.* The officers must have had a reasonable belief that 129th Avenue was Deridder's residence at the time of entry—the morning of March 10, 1998. The question becomes, then, whether or not the passage of time and the acquisition of additional information so eroded the reasonable belief that 129th Avenue was Deridder's residence on June 27, 1997, that believing this was his residence on March 10, 1998, was not reasonable. In other words, unless the belief that Deridder resided at 129th Avenue was still a reasonable belief on March 10, 1998, the entry was unconstitutional.

Agent Mahoney testified that on August 20, 1997, he observed at the 129th Avenue address the red Chevy pickup truck, in which Deridder received a ticket on June 4, 1997, and in which Abascal and Masferrer observed Deridder leave the 129th Avenue address on June 27, 1997. The magistrate judge did not mention this fact in its report and recommendation, nor did the district court note it.[5] Nonetheless, we find this fact important. It extends the basis for believing that Deridder was dwelling at the 129th Avenue residence to August 20, 1997, by showing that the vehicle Deridder was known to drive was there on that date.[6]

Furthermore, the August 20, 1997, Autotrac report on Flight Equipment, Inc., listed Deridder as an historical principle, in particular a former registered agent and director, with an address of 129th Avenue. This report also indicated that the previous address of Flight Equipment, Inc., was 129th Avenue. Although the report provided a new address for the company—832 East 21st Street, the address also given for its current registered agent, Jaime Oubuna, this does not suggest that Deridder's address was no longer 129th

---

[5]There is no indication that the magistrate judge found Mahoney or any of the officers' testimony noncredible; to the contrary, at the conclusion of the hearing, the magistrate judge remarked, "I think the officers did a very nice job in being very candid," and in his report and recommendation, he noted conflicts in the evidence were not resolved on the basis of the credibility of witnesses.

[6]Bervaldi argues that the district court, by stating "No information obtained after June 1997 ever established or confirmed that DeRidder was still living at the 129th Avenue location, even part-time, or as one of two residences on March 10, 1998," and "No vehicles owned or operated by DeRidder were traceable to that location between June 1997 and March 1998," made an implicit finding that the August 20, 1997, observation, which the district court failed to mention, was not evidence linking Deridder to that location. To the extent the district court made a factual finding that no evidence linked Deridder to the 129th Avenue residence after June 27, 1997, we find it clearly erroneous in light of the August 20, 1997, observation of the Deridder vehicle at that address.

Avenue. In fact, it suggests just the contrary—*i.e.,* while Deridder was the registered agent, the company's address was Deridder's address, 129th Avenue, but that when Deridder became an "Historical" principle the company's address changed to that of its current registered agent, Oubuna.

In light of the August 20th observation of the Deridder vehicle at the address, we conclude that the officers reasonably believed that Deridder resided at 129th Avenue on August 20, 1997. However, the question remains whether this information and Deridder's statements to the officers became stale in the 6 months and 21 days between August 20, 1997, and the March 10, 1998, entry.

We have developed a staleness doctrine in the context of probable cause which requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues. *See United States v. Harris,* 20 F.3d 445, 450 (11th Cir.1994) ("For probable cause to exist, however, the information supporting of the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant."); *United States v. Domme,* 753 F.2d 950, 953 (11th Cir.1985) ("As with other types of search warrants, the probable cause needed to obtain a wiretap must exist at the time surveillance is authorized"); *see also Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."). Although reasonable belief is different than probable cause, *see Magluta,* 44 F.3d at 1534-35, we find this staleness doctrine instructive here. There is no particular rule or time limit for when information becomes stale. *See Harris,* 20 F.3d at 450 ("When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations."); *United States v. Bascaro,* 742 F.2d 1335, 1345 (11th Cir.1984) ("No mechanical test exists for determining when information becomes fatally stale."). Rather, " 'staleness is an issue which must be decided on the peculiar facts of each case.' " *Bascaro,* 742 F.2d at 1345 (quoting *United States v. Hyde,* 574 F.2d 856, 865 (5th Cir.1978)); *see Domme,* 753 F.2d at 953 ("[S]taleness is an issue that courts must decide by evaluating the facts of a particular case.").

The courts are not without guidance, however. In addition to the length of time, courts should

consider the "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *Harris,* 20 F.3d at 450; *see also United States v. Haimowitz,* 706 F.2d 1549, 1555 (11th Cir.1983) ("In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime.") (internal quotation marks and citation omitted). For example, the former Fifth Circuit held that four-month-old reports of projectiles in the walls and floors of a dwelling as a result of the test-firing of the murder weapon were not stale because the "floors and walls of a house are relatively permanent fixtures and would not likely be subject to removal over the period of four months." *United States v. Diecidue,* 603 F.2d 535, 560 (5th Cir.1979).[7] In considering the nature of the crime, we have distinguished between criminal activity which is protracted and continuous and that which is isolated:

> "The circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."

*Bascaro,* 742 F.2d at 1345-46 (quoting *Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973)); *see also Harris,* 20 F.3d at 451 ("Although most of the information contained in the affidavit referred to events which took place over two years before Geer applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted conspiracy.... Because the affidavit alleged ongoing activity and a continuing relationship between the coconspirators, the information is not fatally stale."); *Domme,* 753 F.2d at 953 ("When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause.").

Residency in a house, like protracted and continuous criminal activity or projectiles embedded in the house's walls and floors, generally is not transitory or ephemeral, but instead endures for some length of time. Although Deridder's statement in June of 1997 and the observations of Deridder in June of 1997 and of his vehicle in June and August of 1997 are isolated pieces of evidence, they support, as we concluded above, a reasonable belief that Deridder resided at 129th Avenue. It was reasonable for the officers to believe

---

[7]Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are circuit precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

that, because Deridder resided at 129th Avenue, he would reside there for some period of time.  How long

the officers could reasonably believe this period would extend is difficult to say.  As in the probable cause

context, we hesitate to set an arbitrary length of time.  However, on the facts of this case, we believe that it

was reasonable for the officers to believe that the residency extended for at least 6 months and 21 days.  As

explained below, the officers' efforts in this case to refresh the information did not indicate that Deridder had

changed residence.  In the probable cause context, we have found that information can remain fresh for longer

than the period of time at issue here.  For example, in *United States v. Hooshmand,* 931 F.2d 725, 735-36

(11th Cir.1991), we found that an eleven-month-old report from an informant of his employer's fraudulent

activities was not stale where the activities were protracted and ongoing and that it was sufficient to support

probable cause for a warrant.  Thus, we conclude that the passage of time alone did not erode the reasonable

belief that Deridder resided at 129th Avenue.

We turn then to the information acquired during this passage of time to determine if it eroded the

reasonable belief.  On February 4, 1998, Agent Mahoney conducted another Autotrac search on Deridder.

Although this Autotrac report linked Deridder to both the 129th Avenue address and the 132nd Place address,

the report indicated that its information was as of June, 1997.  As of that time, the officers knew that Deridder

was living at the 129th Avenue address, and that the 132nd Place address was merely his parents' address.

We readily conclude that the mention here, and elsewhere, of the 132nd Place address does little to undermine

the officers' reasonable belief that Deridder actually resided at the 129th Avenue address, and that he merely

used his parents' address for various documents, such as his driver's license.[8]

Because unobserved, extended surveillance of 129th Avenue was impractical given the

neighborhood's layout, the officers conducted occasional drive-bys of the 129th Avenue residence.  On none

of these drive-bys after Mahoney's August 20, 1997, observation did the officers observe either Deridder or

the red Chevy truck that Deridder was known to use.  The officers, however, did notice a for sale sign.  The

---

[8]The district court found that the Autotrac report "showed no current information at all on addresses linked to DeRidder after June, 1997."  We agree.  Despite the agent's efforts to refresh the information acquired in June, the Autotrac report revealed nothing more recent about Deridder's residence.

district court found that the for sale sign was not present on the day of the entry. Bervaldi argues that this should have put the officers on notice that Deridder no longer resided at 129th Avenue. The court, however, did not find that the officers noticed that the sign was not present. Given that the officers approached the house in predawn darkness,[9] it is understandable that they did not notice its absence. Determinations of reasonable belief are based on "the facts and circumstances within the knowledge of the law enforcement agents." *Magluta,* 44 F.3d at 1535. Therefore, so long as the officers did not notice the sign, it is not significant that photographs taken later in the day do not depict the sign, that Brooks and Molina, occasional workers at the residence, do not recall the sign being there in the winter of 1997-98, or that the sign was not present that day.[10]

Bervaldi argues that the officers could have discovered that Deridder was not residing at 129th Avenue if they had gone beyond the occasional drive-bys and Autotrac reports after the summer of 1997. First, Bervaldi argues that a "Dossier" search, another more expansive type of search on the Autotrac system, would have shown that Bervaldi registered a vehicle to the 129th Avenue address in January of 1998. Agent Mahoney indicated that he did not run this type of search because in his experience it was not generally useful. Second, Bervaldi argues that the officers should have at least checked the county property records and that if they had done so they would have discovered that Marcella and Phillip Deridder had sold the house in February. We note that the transfer was not recorded until March 5, 1998, five days before the challenged entry. In light of the other information supporting the officers' reasonable belief that this was Derrider's residence, we do not believe that the Constitution required that they also check property records. Likewise, though a check of the utility records prior to the entry would have revealed that the customer was changed from either Marcella Deridder or Phillip Deridder to Beatriz Ramos around the beginning of the year, we do

---

[9]According to the charts calculated by the United States Naval Observatory, the sun rose in Miami on March 10, 1998, at 6:35 a.m. *See* Astronomical Applications Department, U.S. Naval Observatory, *Sun or Moon Rise/Set Table for One Year,* (accessed Aug. 7, 2000) <http: / /aa.usno.navy.mil/AA/data/docs/RS ONEYEAR. html>. We take judicial notice of this fact. *See* Fed.R.Evid. 201.

[10]In any event, the absence of the sign permits several possible inferences including that the owners abandoned their attempts to sell the house and that they sold the house but that Deridder still resided there as a tenant, as well as that the house was sold causing Deridder to move.

not believe that the officers, in light of the information they already had, were constitutionally obligated to check these records. At oral argument, conceding as much, defense counsel agreed that the law does not currently impose a requirement to check utility records or property records. Although the officers could have checked into these matters, we do not believe that their failure to do so is inconsistent with a reasonable belief that Deridder resided at 129th Avenue. We conclude that the officers had a reasonable belief that 129th Avenue was Deridder's dwelling on March 10, 1998.

Having concluded that the officers reasonably believed that 129th Avenue was Deridder's dwelling, we turn to the second part of the inquiry: did the officers have "reason to believe" that Deridder was within the dwelling when they entered on the morning of March 10, 1998. The officers approached the house around 6:00 in the morning. They noticed several vehicles parked at the residence. When they knocked on the front door, someone answered the door. We have noted that "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta* 44 F.3d at 1533. It was reasonable to believe, in the absence of contrary evidence, that Deridder would be at his residence at 6:00 in the morning. Even defense counsel conceded at oral argument that if the officers reasonably believed that Deridder resided at 129th Avenue, then they had reason to believe he was on the premises at that time. The fact that vehicles were parked at the residence only buttresses the belief that persons were at the house, including presumably Deridder. Although Deridder did not answer the door, it was not immediately clear that the person who answered the door was not Deridder. Indeed the court below concluded that the officers had reason to believe that the person they saw who answered the door was Deridder. In any event, the fact that someone other than Deridder answered the door would not eviscerate the reasonable belief that Deridder was in the dwelling at the time the officers approached and entered the dwelling. We conclude that the officers had reason to believe that Deridder was in the dwelling, which the officers reasonably believed was his residence, at the time that they entered it. Thus, the officers were permitted to enter the dwelling to attempt to execute the arrest warrant and did not

violate the Fourth Amendment. *See Payton,* 445 U.S. at 603, 100 S.Ct. at 1388.[11]

Because the entry was permitted under *Payton,*[12] we see no reason Bervaldi's statements or the evidence seized should have been suppressed. In *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990), the Supreme Court held that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." In addition, the Court explained that the officers may go beyond that to sweep an area that a reasonably prudent officer believes, based on articulable facts, harbors an individual posing a danger to those on the arrest scene. *See id.* The officers conducted a protective sweep of the entire 129th Avenue residence. To the extent this sweep may have exceeded the area "immediately adjoining the place of arrest," we conclude that a reasonably prudent officer could believe, based on the cocked 9 millimeter pistol observed in the dwelling[13] and the

---

[11]We note that Bervaldi's reliance on *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), is misplaced. In *Steagald,* the Supreme Court held that a search warrant was required to enter one person's residence to execute an arrest warrant on another person believed to be in that residence. *See id.* at 213-16, 101 S.Ct. at 1648-49. However, the Court recognized that under *Payton,* an arrest warrant for a suspect permitted officers to enter what they reasonably believed was that suspect's residence when they reasonably believed the suspect was there. *See id.* at 214 n. 7, 101 S.Ct. at 1648 n. 7. As explained above, the officers had a reasonable belief that the 129th Avenue residence was Deridder's residence, not some third party's residence as in *Steagald,* and that he was there at the time; thus, *Payton,* not *Steagald,* applies.

[12]Bervaldi does not argue that the mode of entry was unreasonable under the circumstances. Although the officers kicked the door down and entered, Bervaldi's failure to rely on this is understandable in light of the following facts: the officers had knocked on the door for ten minutes; a man whom the officer thought was Deridder finally answered the door and seemed to be concealing something, which the officers thought was a gun behind his back; and when the officers, with jackets featuring the word "police," announced themselves as police, the man promptly slammed the door in their faces. In light of the foregoing facts and the finding of the court below that the officers believed it was Deridder, it is understandable that Bervaldi argues on appeal only the two prongs of the *Magluta* inquiry—whether there was a reasonable belief that it was Deridder's residence, and whether there was a reasonable belief that Deridder was there at the time—and it is understandable that Bervaldi's primary focus is on the former prong.

[13]We note that ordinarily a firearm found on an arrestee does not imply the possible presence of another armed individual. *See United States v. Chaves,* 169 F.3d 687, 692 (11th Cir.), *cert. denied,* --- U.S. ----, 120 S.Ct. 585, 145 L.Ed.2d 486 (1999). However, here a pistol was found on a gym bag on the floor approximately ten feet from the door. Although the pistol may have been abandoned by Bervaldi after he slammed the door and attempted to flee, it could also have been believed to be that of a third party whom the officers had not yet observed and who abandoned it either to flee or, upon recalling that it

reasonable belief that Deridder was in the dwelling, that the house harbored an individual posing a danger sufficient to permit a sweep of its entirety. *See United States v. Tobin,* 923 F.2d 1506, 1513 (11th Cir.1991) (*en banc* ) (holding that a reasonable belief that someone else could be inside the house permits a protective sweep). There is nothing in the record to indicate that the sweep exceeded its proper scope, *i.e.,* it was limited to "a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. at 1099.[14] In the course of this sweep, the officers detected the smell of marijuana. They only questioned Bervaldi after he was told his *Miranda* rights and indicated that he understood them. Bervaldi showed them the marijuana in the kitchen cupboards. No evidence was seized until a search warrant was acquired. This search warrant was supported by probable cause, *i.e.,* the officers' observation of the marijuana that Bervaldi showed them. Thus, we conclude that the district court erred in suppressing the statements and evidence in this case.

### III. CONCLUSION

Accordingly, we reverse the district court's grant of Bervaldi's motions to suppress and remand for further proceedings.

REVERSED AND REMANDED.

---

was unloaded, to retrieve a more potent weapon. The presence of the pistol and the reasonable belief that Deridder was in the dwelling amply support the protective sweep of the entire house.

[14]In his brief on appeal, Bervaldi claims that "the agents opened closets, kitchen cabinets and bedroom drawers." There is no support in the record for this claim. Rather, the testimony of Officers Abascal and Masferrer indicates that the search was properly limited in scope. We also note that during a protective sweep, officers are permitted to open closets, assuming they could harbor a person.