[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13689

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JEFFREY JAMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cr-00007-KD-B-1

_____

Before JILL PRYOR, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

Jeffrey James appeals his conviction for possession of a firearm by a felon. Specifically, James appeals the denial of his motion to suppress evidence discovered as the result of a search of his person and the statements made following that search. James argues that police did not have reasonable suspicion to support the search, rendering it illegal, and that the evidence found on his person and resulting statements were poisonous fruits of the illegal search. He also argues that his statements to police resulted from a custodial interrogation started before *Miranda*[1] warnings were given and should therefore have been suppressed. After review, we affirm.

## I.    BACKGROUND

A federal grand jury indicted Jeffrey James ("James") for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). James moved to suppress evidence and to dismiss the indictment. James sought the suppression of a firearm found on his person during a pat-down search following a traffic stop and his subsequent statements to police. While James did not contest the basis of the traffic stop or its duration, he argued that the officers did not have reasonable suspicion that he was armed and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

dangerous and the search of his person was therefore illegal.  On this basis, he argued that the firearm and his statements about it were the products of an illegal search.  Further, James argued that officers elicited statements from him during a custodial interrogation, prior to administering *Miranda* warnings to him.  Finally, James argued that without the firearm and statements, the government lacked any legally obtained evidence and the indictment must be dismissed.

### A. Evidentiary Hearing

The district court held an evidentiary hearing on James's motion.  At the hearing, the government called the two officers who conducted the traffic stop as witnesses and James cross-examined them.  The court then heard argument from James and the government before denying James's motion.

### 1. Testimony of Officer Blake Russell

Officer Blake Russell, formerly of the Mobile, Alabama Police Department, testified that from 2018 to 2021, he was assigned to a "hot-spot area"[2] in Mobile.  On the night of August 14, 2020, Officer Russell pulled over a black Ford Escape for a traffic violation in one of his assigned hot-spot areas.  Officer Russell wore a body camera that recorded the events of the stop and the footage

---

[2] Officer Russell testified that "hot-spot areas" are areas that experience high levels of violent crimes such as shootings, robberies, and domestic violence as well as drug activity.

from the camera was shown at the hearing.  The footage shows the following events.

After pulling over the black Ford Escape, Officer Russell, along with Officer Jorge Chiang, approached the vehicle.  There were three people inside the car—a female driver, a female passenger in the front passenger seat, and James in the rear seat of the car.  After requesting a license and proof of car insurance from the driver, Officer Russell asked the occupants if there were any weapons in the vehicle.  The driver, handing over several documents, responded that there were no weapons in the vehicle. The video shows James speaking with Officer Chiang during the initial moments of the stop, showing his hands to Officer Chiang, moving them to his lap, and reaching towards his pockets.  Officer Russell again asked whether there were any weapons in the vehicle and James responded that he had turned over his pocketknife to Officer Chiang.  James provided his identifying information to Officer Russell.

Officer Russell then asked each occupant individually if they had any weapons or narcotics in the vehicle.  The driver admitted that she had an open container in the vehicle.  James responded for a second time that he had given his pocketknife to Officer Chiang: "I just gave him my knife, but what I'm trying to see is, y'all got probable cause to search?  I don't care.  I don't care.  Is y'all got probable cause."

The officers asked each occupant to exit the car and sit on the front bumper of the patrol vehicle.  When James exited the car,

Officer Russell informed James that he would pat him down. While James turned to put his hands on the car, he informed Officer Russell that he received a ride from the female occupants to "take this back, somebody left it in my car." Officer Russell handcuffed James, proceeded with the pat-down, and located a pistol in James's right pant leg. Officer Russell asked James if he had a permit for the gun and James responded that he did not. James informed Officer Russell that the pistol was not his and reiterated repeatedly that he was "taking it back." Officer Russell placed James in the back seat of his patrol vehicle.

Several minutes later, Officer Russell read James his *Miranda* rights and questioned him about the firearm. James told Officer Russell that the firearm belonged to his cousin, James did not have a pistol permit and he had a prior felony conviction.

At the evidentiary hearing, Officer Russell stated that upon approaching the vehicle, he immediately smelled marijuana, he observed open containers in the front seat, and he noticed the slurred speech and nervous behavior of the occupants. He testified that the occupants were speaking over each other, which he considered might have been an attempt to distract the officers.

As for James's behavior, Officer Russell testified that when he asked James whether he had any weapons or narcotics, James "hesitated" and questioned whether Officer Russell had probable cause to search. Officer Russell testified that as a result of his training and experience, he interpreted this as a sign that James was deceptive or hiding something.

Officer Russell explained that he asked James and the two females to step out of the vehicle "[f]or officer safety" due to the nervousness of the occupants and because the officers were outnumbered. He decided to pat down James because James displayed signs of nervousness and deception and James's baggy clothes made it impossible for Officer Russell to tell if James was carrying a weapon. When Officer Russell began the pat down, James started apologizing and repeatedly stated that he was trying to "take it back," which Officer Russell took to mean that James was attempting to admit that he was carrying a weapon. Officer Russell stated that James cooperated with the officers in providing accurate personal information and showing his hands when the officers approached the vehicle. No marijuana was found in the car or on any of the occupants.

2.  Testimony of Officer Jorge Chiang

The government next called Officer Chiang to testify, showing footage from his body camera, which begins shortly after James turned over his pocketknife to Officer Chiang. The footage is consistent with the footage from Officer Russell's body camera.

After Officer Russell placed James in the back of the patrol vehicle, but prior to him receiving *Miranda* warnings, the footage shows Officer Chiang approaching the vehicle and asking James if he called out for him. James responded, "Yes, sir" and Officer Chiang asked James, "What's up, man?" Officer Chiang did not provide *Miranda* warnings to James upon approaching the vehicle. James explained to Officer Chiang that his cousin, who James

believed had a pistol permit, left the pistol in James's girlfriend's car. James could not leave the firearm in his girlfriend's car because his girlfriend has two children. James's cousin told James to bring the pistol back to him and, while walking the pistol back to his cousin, James called the female occupants for a ride. James stated that there was "one in the clip" and reiterated that he does not "play with" firearms.

Officer Chiang then asked James, "So he let you put yourself in that spot?" James responded that he did not want firearms around him and, because he typically walks from place to place, he did not want to walk around with a firearm on his person. Officer Chiang responded, "Right," and asked James why he did not mention the pistol when he turned over his pocketknife. James stated that he knew he was not supposed "to be around them" and that he would go to jail if found with a firearm. James reiterated his explanation for having the gun, his attempts to return it to his cousin, and his understanding that he was not supposed to have it. Officer Chiang asked James if the pistol was stolen and James stated that he did not know.

On cross-examination, Officer Chiang testified that the area in which he and Officer Russell stopped James was a high-crime area known for burglaries but stated that he did not have crime statistics for the area on hand. Officer Chiang did not recall smelling marijuana when he approached the vehicle.

### B. District Court's Findings and Rulings

Following argument from James and the government, the district court found that the officers had reasonable suspicion to initiate a frisk of James's person based on concerns for officer safety. The court summarized its findings:

> [T]here was sufficient evidence to support that the officer[s] had reasonable suspicion for the pat-down for officer safety based on the [fact that] the officers were outnumbered, particularly when they approached the car. The defendant had slurred speech. The smell of marijuana. He wouldn't answer the questions. He evasively answered the questions. And then produced that he at least had one weapon. At that point—and also the fact that he was wearing the baggy clothes gave the officer more than what he needed to do an officer safety pat-down to—on him.

The court also found that James was in custody the moment that Officer Russell handcuffed him prior to patting him down. However, because the government stated on the record that it would not seek to use James's pre-*Miranda* statement that he did not have a pistol permit, the court ruled that James's motion to suppress that statement was moot. Similarly, because the government conceded that James's pre-*Miranda* statement to Officer Chiang that he did not know whether the gun was stolen was not admissible, the court ruled that James's motion to suppress that statement was also moot. Finally, the court ruled that James's post-*Miranda* statements to Officer Russell were admissible.

As to the remaining statements, the court ruled that James had not made any incriminating statements to Officer Russell prior to receiving the *Miranda* warnings. Lastly, the court ruled that James's statements to Officer Chiang, up until responding to Officer Chiang's question of whether the gun was stolen, were also admissible. The court thus denied James's motion.

### C. Guilty Plea, Sentencing, and Appeal

James pleaded guilty to possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) reserving his right to appeal the district court's denial of his motion to suppress. The district court sentenced James to 37 months' imprisonment, adjusted to 32 months for time served, followed by a three-year term of supervised release. James appealed his conviction, the district court's judgment, and the denial of his motion to suppress.

## II.    ANALYSIS

On appeal, James makes two arguments: (1) the officers did not have reasonable suspicion that James was armed and dangerous and thus the *Terry*[3] frisk was unlawful; and (2) James's statements were fruits of an illegal search and violated his Fifth Amendment rights.

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

### A. Reasonableness of the Terry Frisk

We review a district court's denial of a motion to suppress under a mixed standard, reviewing the district court's findings of fact for clear error and its application of the law to those facts *de novo*. *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000). We also construe all facts in the light most favorable to the prevailing party below. *Id.* A factual finding is clearly erroneous if, after reviewing all the evidence, we have a definite and firm conviction that the district court made a mistake. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010). When there is a credibility dispute, we will not reverse the factfinder for clear error unless the testimony is "so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (quotation omitted). Questions of probable cause and reasonable suspicion are reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

As a general matter, any evidence obtained through unconstitutional searches and seizures is inadmissible. *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961). This exclusionary rule extends beyond the direct products of the constitutional violation to the "fruit of the poisonous tree"—evidence that became available only through the exploitation of the police misconduct, rather than through an independent, legitimate search. *Wong Sun v. United States*, 371 U.S. 471, 485, 488 (1963).

In interpreting the Fourth Amendment's protection against unreasonable searches and seizures, the Supreme Court has held

that an officer may frisk a legally stopped individual for weapons if he reasonably believes that the individual is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Similarly, an officer may conduct a pat-down search of a person seized during a lawful traffic stop, if the officer has a reasonable suspicion that the individual is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). We evaluate the totality of the circumstances to determine whether the officer's suspicion was reasonable. *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (*en banc*). Circumstances considered include "the number of officers" at the scene, and a person's nervous, argumentative, or evasive behavior. *Id.*; *United States v. Bishop*, 940 F.3d 1242, 1248–49 (11th Cir. 2019). The reasonable suspicion inquiry "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). Still, an officer's suspicion, based on inferences drawn in light of his experience, must rise beyond an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27 (quotations omitted).

We turn first to the district court's factual findings supporting reasonable suspicion. The district court found that

James had slurred speech, he did not answer some questions at all, he answered other questions evasively, he had already produced one weapon, he was wearing baggy clothes, the officers were outnumbered, and Officer Russell smelled marijuana. James challenges two of these findings. He contends that the record evidence does not support that he had slurred speech or that the car smelled of marijuana.[4]

James has not shown that the district court clearly erred in making these factual findings. We cannot say that we have a "definite and firm conviction" that the district court incorrectly

---

[4] Throughout his briefs, James contends that other facts upon which the government relies as support for reasonable suspicion are contradicted or otherwise not supported by the record—such as the characterization of the area as "high crime," that James acted "evasive, confrontational, and argumentative," and that James moved his hands frequently, not keeping them in view the entire time he was in the vehicle. James also argues that "nervousness does not create reasonable suspicion that a person is armed and dangerous." The district court, however, did not make factual findings on whether the area was high-crime or whether James acted confrontational or argumentative. Nor did the district court make an explicit finding characterizing the movement of James's hands during the stop or as to whether James's apparent nervous behavior, to which both officers testified, supported reasonable suspicion for the frisk. We will therefore not discuss James's arguments as to those facts here. Rather, we focus our analysis on the only two factual findings James challenges as clearly erroneous: the marijuana odor and his slurred speech. To the extent that James seeks to challenge as clearly erroneous the district court's findings that he was acting evasively and would not answer certain questions, we have reviewed the body camera footage from both officers and conclude that the district court did not commit clear error.

concluded that James's speech was slurred after review of the body camera footage. *Villarreal*, 613 F.3d at 1349. As for Officer Russell's testimony that he smelled marijuana coming from the vehicle, the district court was permitted to make a credibility determination in conducting its reasonable suspicion analysis. The mere fact that the two officers had somewhat inconsistent testimony does not render the district court's finding clearly erroneous. *Anderson*, 470 U.S. at 575 ("[W]hen a [district court's] finding is based on [its] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); *see also United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005). The district court was therefore free to credit Officer Russell's testimony that he smelled marijuana. Indeed, "[w]here two permissible views of the evidence exist, 'the factfinder's choice between them cannot be clearly erroneous.'" *United States v. Holloway*, 74 F.3d 249, 252 (11th Cir. 1996) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). It is not clear from the face of the evidence that this testimony was "so inconsistent" such that we could conclude the district court clearly erred. *Pineiro*, 389 F.3d at 1366.

James also argues that the officers did not have a particularized and objective basis for their reasonable suspicion that James was armed and dangerous. We disagree. The totality of the circumstances indicates that the pat-down was reasonable.

It was late at night, the officers were outnumbered, and all of the occupants exhibited slurred speech.  One of the officers smelled marijuana coming from the vehicle.[5]  Additionally, although James had already turned over one weapon to police, when asked whether there were other weapons in the car, he responded evasively and questioned the officers about the basis for probable cause.  These factors taken together gave Officer Russell "reason to believe that he was 'dealing with an armed and dangerous individual'" and that the officers' safety may be in danger, which justified the pat-down of James. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quoting *Terry*, 392 U.S. at 27).

Accordingly, the district court did not err in denying James's motion to suppress.

---

[5] James argues that because the officers did not mention the marijuana odor at the time of the stop or did not find any marijuana in the vehicle, the odor cannot support reasonable suspicion.  However, as James notes, we have held that "marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct." *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010).  Moreover, the district court was free to credit Officer Russell's testimony as to the marijuana odor in the absence of directly contradictory extrinsic evidence and where Officer Russell's testimony was not internally inconsistent. *Anderson*, 470 U.S. at 575; *Holloway*, 74 F.3d at 252.

### B. Suppression of James's Statements

James argues that the district court erred in denying his motion to suppress the statements he made to Officer Chiang while seated in the rear of the patrol vehicle before receiving *Miranda* warnings. Specifically, he argues that, in response to Officer Chiang's questions, he stated that he did not voluntarily produce the firearm when he produced the knife because he was a felon and knew he was not supposed to have a firearm. He argues that suppression of his statements to Officer Chiang was warranted for two reasons: (1) the statements were made following an illegal frisk; and (2) the statements were obtained in violation of his Fifth Amendment rights. As discussed above, the frisk was lawful. We therefore turn to James's Fifth Amendment arguments.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the Supreme Court established that statements made during a custodial[6] interrogation are not admissible at trial unless the defendant was first advised of his rights, including the right against self-incrimination. *Miranda*, 384 U.S. at 444–45. A person in custody is subject to "interrogation" when they face "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). This includes

---

[6] The district court found that James was in custody for purposes of *Miranda* when he was handcuffed by Officer Russell. Neither James nor the government argue that this finding was erroneous.

any "words or actions" by the police "other than those normally attendant to arrest and custody" that the police should have known were "reasonably likely to elicit an incriminating response." *Id.* at 301. Interrogation reflects a "measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. A defendant's volunteered statements are not barred by the Fifth Amendment. *Miranda*, 384 U.S. at 478. Accordingly, "a district court need not suppress spontaneous remarks that are not a product of interrogation." *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983) (quotations omitted).

Additionally, the "simple failure to administer the [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," does not taint the investigatory process to the point that a subsequent voluntary and informed waiver is ineffective. *Oregon v. Elstad*, 470 U.S. 298, 301 (1985). "[C]ourts are not to presume that the existence of [an] earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper *Miranda* warnings removes the effect of any conditions requiring suppression of the unwarned statement." *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006).

Harmless error review applies to decisions denying motions to suppress on Fifth Amendment grounds. *United States v. Arbolaez*, 450 F.3d 1283, 1292 (11th Cir. 2006). To find that an error was harmless on direct appeal, we must determine that the error

was "harmless beyond a reasonable doubt." *United States v. Lall*, 607 F.3d 1277, 1292–93 (11th Cir. 2010) (quotation marks omitted). In making that determination, we must determine whether there is a reasonable probability that the erroneously admitted evidence "might have contributed to the conviction." *Arbolaez*, 450 F.3d at 1292–93. Importantly, the improper admission of statements made before an individual received *Miranda* warnings is harmless where the statements were encompassed by a subsequent, properly admitted statement. *Street*, 472 F.3d at 1315.[7]

James challenges the admission of his pre-*Miranda* statement to Officer Chiang that he did not turn over the firearm at the same time as the pocketknife because he knew, as a felon, he was not supposed to have a firearm. Assuming that admission of this statement was error, the error is harmless. As demonstrated from Officer Russell's body camera footage, James, after receiving his *Miranda* rights, informed Officer Russell that he was a convicted felon, that he did not have a pistol permit, and that he

---

[7] We recognize that harmless error review does not fit neatly with this case. It is difficult to discern whether denial of the motion to suppress made a difference to James's conviction because he pleaded guilty. However, James does not argue on appeal that, but for denial of his motion, he would not have pleaded guilty. Furthermore, even assuming it was error to admit his statements to Officer Chiang, there was sufficient admissible evidence to convict him of possession of a firearm by a felon; namely, James admitted to Officer Russell after receiving *Miranda* warnings that he was a convicted felon, that he did not have a pistol permit, and that he knew he was not supposed to have a firearm in his possession.

knew he was not supposed to have a firearm in his possession. Therefore, because the challenged information in James's statement to Officer Chiang was also included in James's post-*Miranda* statements to Officer Russell, any error in the admission of his pre-*Miranda* statements was harmless. *Street*, 472 F.3d at 1313, 1315.

Moreover, based on James's post-*Miranda* statements, there was sufficient evidence to conclude that James was a felon, that he knew of his status of a felon, and that he knowingly possessed a firearm, which is all that is required for the offense of felon in possession of a firearm. *See Rehaif v. United States*, ___ U.S. ___, 139 S. Ct. 2191, 2200 (2019). Accordingly, there is no reasonable probability that James's pre-*Miranda* statements might have contributed to conviction. *Arbolaez*, 450 F.3d at 1292–93.

Accordingly, the district court did not err in denying James's motion to suppress the statements about the firearm made to Officer Chiang.

## III.    CONCLUSION

The district court did not err in denying James's motion to suppress. Officer Russell's pat-down search was lawful because it was supported by reasonable suspicion that James was armed and dangerous. Additionally, even assuming that the district court erred in failing to suppress some of James's pre-*Miranda* statements, because James made the same admissions after receiving *Miranda* warnings, any such errors were harmless. As

such, there is no reasonable probability that the pre-*Miranda* statements contributed to his conviction.

**AFFIRMED.**