**Tamara BRAND and Theo Brand, Plaintiffs,**

**v.**

**Kevin CASAL and Teresa Pardinas, Defendants.**

**Civil Action No. 1:13–CV–0322–AT.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed Sept. 28, 2015.

---

Ralph S. Goldberg, Goldberg & Cuvillier, P.C., Tucker, GA, for Plaintiff.

Jason C. Waymire, Williams, Morris & Waymire, LLC, Buford, GA, Michael Van

Stephens, II, Scott James Fuller, Gwinnett County Law Department, Lawrenceville, GA, for Defendant.

### ORDER

AMY TOTENBERG, District Judge.

Shortly before midnight on February 7, 2011, Deputies Kevin Casal and Teresa Pardinas went to the residence of Mrs. Tamara Brand and Mr. Theotis Brand (the "Brands") to execute an arrest warrant for the Brands' son, Wesley Brand.[1] Mrs. Brand and Deputy Casal got into a physical altercation, and Mrs. Brand was then tased by Defendant Pardinas. The Brands brought this action seeking damages for Defendants' various violations of the Brands' rights under the United States Constitution, the Georgia Constitution, and Georgia state law. The case is currently before the Court on Plaintiffs' Motion for Partial Summary Judgment [Doc. 29] (the "Motion").[2]

Plaintiffs seek summary judgment on four Fourth Amendment claims:

1. Deputy Pardinas's entry into Plaintiffs' backyard without a search warrant;
2. Deputy Casal's entry through the front door without a search warrant;
3. Both Deputies' performance of a protective sweep; and
4. Both Deputies' purported failure to cover up Mrs. Brand after ripping her shirt.

## I. LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there

---

1. Since the events in this case, Wesley Brand changed his name to Trystynn Sayter and began identifying as a female. Solely because almost all of the evidence in this case refers to "him" as "Wesley Brand," the Court will do so here.

2. The Court **DEFERS** ruling on Defendants' Motion for Summary Judgment [Doc. 60] at this time but will issue a follow-up order on Defendants' motion shortly.

is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the nonmoving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Where the moving party bears the burden of proof at trial, as here, the moving party must affirmatively demonstrate the absence of a genuine dispute of material fact as to each element of its claim on that legal issue. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of a dispute of fact. *Id.*

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. In deciding this essential question, the court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (11th Cir.1994) (en banc). Defendants' testimony is treated as true for purposes of review of Plaintiffs' pending Motion for Summary Judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (when reviewing the record evidence at the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party").

## II. BACKGROUND FACTS

In the following factual summary, the Court presents the undisputed facts as well as other evidence in the light most favorable to Defendants, the non-movants. *See Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. This summary does not represent the Court's actual findings of fact. *See Rich v. Sec'y, Florida Dep't of Corr.,* 716 F.3d 525, 530 (11th Cir.2013).

### A. Facts leading up to initial encounter

On November 4, 2010, a Gwinnett County Magistrate Judge issued a warrant for Wesley Brand's arrest for the crime of theft by taking of a motor vehicle, a felony. (Deposition of Deputy Kevin Casal Ex. 3, Arrest Warrant, Doc. 47 at 30.) The warrant was sworn out by Gwinnett County Police Department, which is not a party to this case. (Casal Dep. at 21:2–3.) Defendant Deputy Kevin Casal, of the Gwinnett County Sheriff's Department, was later tasked with serving that warrant. (*Id.* at 20:17–21:8.)

According to the arrest warrant, Wesley Brand was a 27–year–old white male. (*Id.* at 17; Doc. 47 at 30.) The warrant did not give Wesley's address, (*id.*), so Deputy Casal investigated and found an address for him on a Gwinnett County Jail Booking Sheet ("Booking Sheet") from less than one month before the warrant had been sworn out. (Doc. 47 at 31.) Once Deputy Casal found that address, he did no further investigation as to the location of Wesley Brand's residence. (*Id.* at 20.) The Booking Sheet listed 4179 Valley Brook Road, Snellville, GA as Wesley's address.

At approximately 11:00 PM on Monday, February 7, 2011, Deputy Casal and his partner, Deputy Teresa Pardinas, arrived at 4179 Valley Brook Road to serve the warrant. (Casal Dep. at 51:12–13; Casal Incident Report.[3]) At the time they arrived, Deputy Casal did not "know" that Wesley lived there. (Casal Dep. at 19:7–10.) Rather, Deputy Casal considered it a "third-party warrant." (*Id.* at 21:22–24.)

Before service was attempted, Deputy Pardinas went around to the back of the house "to prevent escape of the warrant suspect," (Declaration of Teresa Pardinas ¶ 6, Doc. 44–2), while Deputy Casal stayed at the front to see if Wesley could be located inside the house. (Casal Incident Report.) There was a car in the driveway, so Deputy Casal called his dispatcher and had her run the license plate number. (Dispatcher Audio Tape[4] at 1:30.) The license plate returned to Theotis Brand. (Dispatcher Audio Tape at 2:30.)

At the front door, Deputy Casal encountered Jayne Velazco, who had gone out onto the front porch to smoke a cigarette. (Casal Incident Report; Deposition of Ms. Jayne Velazco at 16:23–17:17, Doc. 49.) The front porch, where much of the action in this case took place, is shown in the photographs below:

3. The Incident Report is properly before the Court on summary judgment because it "could be reduced to admissible evidence at trial" for the facts the Court recognizes that it supports in this Order. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir.1999). Deputy Casal authenticated the report in his deposition, (Casal Dep. at 8), and he has testified consistently with the Incident Report.

4. Defendants' Motion to Supplement the Summary Judgment Record under Fed.

R.Civ.P. 56(e) is **GRANTED.** The Dispatcher Audio Tape supports certain facts herein, and Plaintiffs do not challenge the authenticity of the recording or object to the submission of the tape. (Doc. 82 at 2 n. 1; Doc. 83 at 1.)

 

(Declaration of Teresa Pardinas Ex. A at 5, Doc. 44–2 at 9 (left photograph); Deposition of Tamara Brand Ex. 2 at 10, Doc. 50–1 at 13 (right photograph).)

Deputy Casal explained who he was and said he was looking for Wesley. Ms. Velazco did not tell Deputy Casal that Wesley was not in the house. (Velazco Dep. at 19:24.) Resolving all factual disputes and drawing all inferences in Defendants' favor, Ms. Velazco responded, "Well, I would like to go in and get his parents, because he [is] a minor[.]" (Trial Transcript, Doc. 75–4 at 7.)[5] She then went inside and shut the door.

Moments later, Mr. and Mrs. Brand came to the door. (Casal Incident Report.) Deputy Casal identified himself and explained why he was there, and then asked where Wesley was. (*Id.*). According to Deputy Casal, Mrs. Brand said she "did not know" where her son was, but that she "was expecting him home" the next day. (*Id.*; Casal Dep. at 23:24–25.)[6]

## B. Deputy Pardinas sees Wesley and the initial scuffle at the front door

While Casal was talking to the Brands and showing them the arrest warrant,

**5.** Ms. Velazco's testimony from Mrs. Brand's criminal trial, in which Mrs. Brand was acquitted on charges stemming from the same events giving rise to this case, is not crystal clear. She testified: "I was sitting outside on the front porch, and I was approached by an officer who had asked me if Wesley was there. He showed me a picture. *I said: Well, I would like to go in and get his parents, because he was a minor at the time.*" (Doc. 75–4 at 6–7 (emphasis added).) Read in the light most favorable to Defendants, "because he was a minor at the time" is not Ms. Velazco's internal motivation for getting Wesley's parents, but it is what she actually said to Deputy Casal. In Ms. Velazco's subsequent deposition, she testified that she said only that she, "would get his mother and father." (Velazco Dep. at 16:23–17:17.) However, resolving all disputes and drawing all reasonable inferences in Defendants' favor, the Court accepts at this stage that Ms. Velazco uttered the quoted language included in the body of this Order.

**6.** Plaintiffs dispute this fact. According to Mr. Brand, Mrs. Brand told Deputy Casal that Wesley did not live at the address and that she did not know where he was. (Deposition of Theotis Brand at 50:21–24, Doc. 64.)

Deputy Pardinas announced over the radio that she had a positive identification on the wanted subject in the back room. (Casal Incident Report; Dispatcher Audio Tape at 3:12 ("Are you aware there is another adult that possibly matches our description in the house?").) Deputy Casal did not respond. Deputy Pardinas radioed him again and asked if he copied. (Dispatcher Audio at 3:20.) Deputy Pardinas testified, "He didn't say anything [in response to that second call], so my red flag goes straight up, and I know something is wrong." (Deposition of Teresa Pardinas at 42:5–24, Doc. 48 (affirming testimony in prior criminal case).)

The Dispatcher Audio Tape makes clear that Deputy Casal then radioed for Deputy Pardinas to come to where he was, and he also called for the dispatcher to "start additional units to this location." (Dispatcher Audio Tape at 3:23.) Deputy Casal's written Incident Report explains what happened next from his perspective. Right after he got the call that a suspect that matched Wesley's description was in the house,

> I explained to both parents that I know the wanted subject is inside the house. As I entered the front door the subject['s] mother Tamara Brand tried slamming the door so I shouldered the door reopening it. Whi[l]e I was standing in the opening, Tamara forcefully pushed me at the chest area knocking me off balance and almost down a flight of stairs. To keep myself from falling I reached out and grabbed Tamara by the front of the shirt. The shirt was ripped but I was able to reestablish my balance.

As I tried reentering the front door Tamara started swinging at my head clawing my hat off my head. I performed a palm heal strike at her chest area pushing her back out of the doorway. The father, Theotis Brand, stepped in the middle holding a screaming newborn baby [and] trying to block my way into the house. I put out a call over radio[7] requesting more officers to the scene and advised dispatch to stop all radio traffic due to the aggressive nature of the family members. Because Theotis was holding a newborn child, I grabbed Theotis by the left shoulder keeping him at an arm['s] distance and off balance while giving verbal commands not to get involved. Tamara advanced again along with another adult later identified as the wanted subject Wesley Brand. Wesley at this time was holding a five year old child identified as [DF]. Both Tamara and Wesley started swinging at my face with closed fists. The whole time I am trying to keep control of Theotis so the newborn [will] not get hurt. The child that Wesley was[ ] holding was very upset screaming, crying and trying to push his way out of Wesley's grip. At this time Deputy Pardinas came around front and entered the house. [*sic*]

(Casal Incident Report.)[8]

### C. Deputy Pardinas joins Deputy Casal at front and Mrs. Brand is tased

According to the above, Deputy Pardinas heard Deputy Casal: (1) fail to respond to her calls; (2) ask her to come

---

7. The Dispatcher Audio Tape corroborates this radio call. (Dispatcher Audio Tape at 3:57.) A female can be heard screaming in the background.

8. The Court recognizes that Plaintiffs have a dramatically different version of the events at issue here. According to Plaintiffs, Wesley presented himself at the front door, said he

meet him at the front of the house; (3) then call for backup. As she came around the front corner of the home, she "saw Deputy Casal struggling with three adults in the doorway of the house." (Pardinas Dep. Ex. 8 & 9, Teresa Pardinas Use of Force Report, Doc. 48 at 31.[9]) Deputy Pardinas saw Mrs. Brand push Deputy Casal twice. (Pardinas Dep. at 48:21–23 (reaffirming criminal testimony).) "Deputy Casal was being pushed back and almost lost his balance." (Pardinas Use of Force Report at 31.)

Deputy Pardinas ran up the stairs to the front porch, drew her X–26 Taser, and "gave loud verbal commands for everyone to step back. Tamara Brand and another person, later identified as Wesley Brand, were actively fighting Deputy Casal." (Pardinas Use of Force Report at 31.)

Wesley Brand had "a small child in his arms" while he fought Deputy Casal. (Pardinas Dep. at 52:7–10.) Deputy Pardinas "continued to give verbal commands," stepped close to Wesley, and "displayed [her] taser to him." (Pardinas Use of Force Report at 31.) She told him "to put

the child down .... [a]nd he wouldn't. So I took the baby's arm and just guided him down to the ground, and he walked away. And then I told Wesley to get down, and he would not." (Pardinas Dep. at 63:4–20.) Mr. Brand also refused to comply "with [Deputy Casal's] commands to stay back. He kept coming closer towards Deputy Casal and I. That's what I observed." (Pardinas Dep. at 57:9–11.)

Deputy Pardinas then entered the home. (Pardinas Use of Force Report at 31.) "Tamara Brand attempted to run upstairs to an unknown location." (Pardinas Use of Force Report at 31; Casal Incident Report.) According to Deputy Pardinas, she "deployed [her] Taser with both probes making contact at the upper back area. [Mrs. Brand] fell to the ground on her stomach and stayed still." (Pardinas Use of Force Report at 31; Casal Incident Report.) Ms. Velazco was not on the stairs at the time. (Casal Dep. at 58:18–59:5.)

According to Deputy Pardinas, "[t]he scene was still not under control and remained volatile. Wesley Brand, along with

---

was Wesley Brand, and went out onto the porch with Deputy Casal. Deputy Casal then said that he wanted to come inside. Mrs. Brand said he couldn't come inside without a search warrant and told Wesley to call 911. Deputy Casal radioed to dispatch that they should disregard the call because he was at the scene. The phone disconnected, but Wesley called back. Deputy Casal then lunged in and grabbed Mrs. Brand by her shirt and left breast as she was straddling the threshold, blocking the entrance to her home. She screamed she was pregnant, and her shirt promptly ripped, sending Casal stumbling back on the porch and exposing her breasts through her bra. She grabbed the phone from Wesley, but Deputy Casal knocked it out of her hand, sending it flying across the floor inside the house. Next, Deputy Casal performed a palm heel strike on Mrs. Brand, sending her back into a sitting position in her

foyer. Plaintiffs also offer a different version of what happened leading up to and following Deputy Pardinas tasing Mrs. Brand, a version that includes officers searching in drawers during their protective sweep. Viewing the evidence in the light most favorable to the non-movant, as the Court must at this juncture, the Court must analyze the claims at issue in this Motion according to the Deputies' versions. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097.

9. Deputy Pardinas's Use of Force Report is also properly before the Court on summary judgment because it too "could be reduced to admissible evidence at trial" for the facts the Court recognizes herein that it supports. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir.1999).

an unidentified male and female, were walking around the common area of the house in a combative manner. I continued giving verbal commands for them to sit down but both parties were not complying." (Pardinas Use of Force Report at 31.)

On the volatility of the situation, facts beyond the Deputies' statements and depositions arguably support their position, if construed in the light most favorable to Defendants. Mrs. Brand testified in her initial deposition (though she later changed her story somewhat) that the situation became "fairly chaotic" after the tasing, with multiple individuals "screaming." (*Id.* at 166:3–16.) Mr. Brand said he started "freaking" when his wife got tased. (Deposition of Theotis Brand at 66:16.) Mr. Brand testified that he said to Deputy Pardinas, "What the fuck's wrong with you?" to which Deputy Pardinas responded by "pull[ing] out her gun on me and my son" and "yelling and screaming to get back, get back, get the fuck back." (*Id.* at 66:16–67:1; Pardinas Use of Force Report at 32 ("I drew my duty pistol to prevent further attack and ordered each of them to come to me and sit on the floor.").)

Deputy Casal kept control of Mr. Brand and the newborn child he was holding while "Wesley stopped his advancing attack and backed up into the kitchen area." (Casal Incident Report.) Deputy Pardinas "gave Tamara loud commands not to get off the floor," and Deputy Casal "escorted Theotis into the kitchen area where Wesley was standing. Deputy Pardinas and I held our ground, watching all family members within our sights. The situation was still volatile due to family members walking around and not listening to commands to sit down." (Casal Incident Report.)

Ms. Velazco's grandson, who had been playing in a room that opened onto the foyer, was spooked by the tasing and immediately ran across the foyer and upstairs to hide. (Velazco Dep. at 56:24–57:3; 57:23–58:4.) According to Ms. Velazco, she "asked repeatedly if [she] could go upstairs to check on him or if someone would check on him, and no one would help [her] out." (*Id.* at 42:24–43:2; 58:10–11.) According to Deputy Pardinas, though, Ms. Velazco was already upstairs and refused to come down:

> Shortly after the time that I tased Ms. Brand, I realized that there was at least one more person upstairs, and I think that was later identified as Ms. Velazco, and I had ordered her to come downstairs, which she wouldn't. She just kept asking me why, and at that time, she would not come downstairs. So I didn't know if there was anybody else upstairs that she was attempting to hide or maybe ... she was trying to keep herself from us.

(Pardinas Dep. at 100:1–11.)

Right around that time, "Gwinnett County Sheriff and Police units entered the house," and Deputy Casal "advised that the upstairs and the basement areas were not clear." (Casal Incident Report.) Sheriff deputies "went downstairs to clear" and police officers "went upstairs to clear" while Deputy Pardinas and Deputy Casal secured Mrs. Brand in handcuffs. (Casal Incident Report.) Deputy Pardinas also advised police officers that the upstairs of the residence had not been cleared. (Pardinas Decl. ¶ 9.) During the protective sweep, while Mrs. Brand was still on the floor, Deputy Pardinas went into a room "to the left of the foyer" and "at least in the stairway" off the foyer that leads down to a lower living room. (Pardinas Dep. at 95:14–96:1.)

Deputy Casal did not recall how long the protective sweep took, (Casal Dep. at

30:18–31:5), but Deputy Pardinas testified that it took "[p]robably less than 15 [minutes]. It could have been a matter of minutes." (Pardinas Dep. at 99:2–5.) She did not believe it was longer than 15 minutes. (*Id.*)

Both Defendants testified that they wanted to have Mrs. Brand assessed by medical technicians before moving her. Deputy Casal testified, "Mrs. Brand had just gotten tased, and I had to get an ambulance out there to check her out." (Casal Dep. at 56:8–9.) Similarly, Deputy Pardinas testified, "Ms. Brand had to get checked by the fire department. I'm not going to have her get up without being checked." (Pardinas Dep. at 94:11–13.)

Deputy Casal had two other deputies handcuff Wesley "for his aggressive actions towards me and his non compliance to cooperate with law enforcement." (Casal Incident Report.) According to Deputy Casal, it took the "help of the additional units" to get the family members "positioned in one room and quieted down." (Casal Incident Report.) Deputy Pardinas's testimony implies that everyone was sitting down slightly earlier, before she holstered her taser and her pistol. (Pardinas Use of Force Report at 32.)

After Gwinnett County Fire Department medical technicians arrived and assessed Mrs. Brand, Deputy Pardinas removed the probes from Mrs. Brand. Deputy Pardinas testified at her deposition that, after she removed the probes, she rearranged Mrs. Brand's shirt "to cover her as much as possible." (Pardinas Dep. at 98:4–5.) Deputy Pardinas submitted a subsequent declaration clarifying that she had "no recollection of Mrs. Brand having asked me or any other officer for additional clothing.

Mrs. Brand's shirt could be, and was, arranged to cover Mrs. Brand's upper body without revealing her breast(s)." (Pardinas Decl. ¶ 10.)

Deputy Casal testified that he "didn't get [Mrs. Brand] a T-shirt." (Casal Dep. at 65:20.) He did not recall whether officers or medical technicians covered her up, but he remembered that she was "covered up when she got to the jail." (*Id.* at 66:5–7.) She rode there in Deputy Pardinas's patrol car. (Pardinas Use of Force Report at 32.)

## III. DISCUSSION

### A. Qualified Immunity

 Defendants argue that they are entitled to qualified immunity for the four federal claims currently before the Court. "The purpose of qualified immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir.2007) (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002)) (internal quotation marks omitted). Officials seeking qualified immunity must first establish that they were acting within their discretionary authority when the alleged constitutional violation occurred. *Lewis v. City of W. Palm Beach,* 561 F.3d 1288, 1291 (11th Cir.2009). If so, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.;* *McClish,* 483 F.3d at 1237.

 For each claim, Plaintiffs must make two showings when challenging Defendants' qualified immunity defenses.[10] First, a plaintiff must show that a defen-

***

10. The Court can begin the qualified immunity analysis with either inquiry. *See Pearson v.*

dant's conduct violated a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Court must review the facts in connection with the alleged violation in the light most favorable to the non-movant. *McClish*, 483 F.3d at 1237.

 Second, a plaintiff must show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 129 S.Ct. 808 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). A right is clearly established if it would have been clear to a reasonable officer that the officers' conduct was unlawful. *See, e.g., Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151; *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir.2011). The "salient question" is whether the state of the law gave the defendant "fair warning" that his alleged conduct was unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The Court "looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir.2011).

 At the outset, the Court notes that there is no evident dispute over whether Defendants were acting within their discretionary authority. "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his

*Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808,

authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir.2011) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). The Court is satisfied that Defendants were clearly acting in their discretionary authority during the relevant events of February 7 and 8, 2011. Thus, the Court turns Plaintiffs' Fourth Amendment claims against Defendants.

**B. Fourth Amendment in general**

 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, —— U.S. ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir.2013) (quoting *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)); *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1330 (11th Cir.2006) (holding that deputies' entry into the Plaintiff's home without a warrant, exigent circumstances, or consent clearly violated established Fourth Amendment law). "The private property immediately adjacent to a home"—the "curtilage"—"is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Taylor*,

172 L.Ed.2d 565 (2009).

458 F.3d 1201, 1206 (11th Cir.2006) (citing *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)).

▮▮▮▮ Defendants did not have a search warrant for 4179 Valley Brook Road. Rather, they had only an arrest warrant for Wesley Brand that did not contain an address. Nonetheless, an arrest warrant can justify entering a home so long as a two-part test is met:

> [I]n order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief
>
> [1] that the location to be searched is the suspect's dwelling, and
>
> [2] that the suspect is within the residence at the time of entry.

*United States v. Magluta,* 44 F.3d 1530, 1533 (11th Cir.1995); *see also Payton,* 445 U.S. at 603, 100 S.Ct. 1371. Common sense factors guide both prongs of this test. *United States v. Bervaldi,* 226 F.3d 1256, 1263 (11th Cir.2000). For example, "officers may presume that a person is at home at certain times of the day." *Magluta,* 44 F.3d at 1535. Officers may also presume that a suspect still lives in a house where he lived six months ago, because "[r]esidency in a house ... generally is not transitory or ephemeral, but instead endures for some length of time." *Bervaldi,* 226 F.3d at 1265. These presumptions may be rebutted by contrary evidence. *Magluta,* 44 F.3d at 1535.

▮▮▮▮ Absent satisfaction of the two-prong test, though, "any physical invasion of the structure of the home, by even a fraction of an inch, is too much." *Moore v. Pederson,* —— F.3d ——, No. 14–14201 at 11 (11th Cir. Sept. 16, 2015) (punctuation omitted) (quoting *Kyllo v. United States,* 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)).

## C. Deputy Pardinas's entry into Plaintiffs' backyard without a search warrant

▮▮▮▮ The first alleged search of the Brands' home occurred when Deputy Pardinas went into the backyard to prevent any attempted flight by Wesley Brand. Plaintiffs claim Deputy Pardinas unlawfully entered the protected curtilage by hurdling a locked chain link gate and peering into windows on the backside of their home when she did not have a reasonable belief that it was Wesley's residence or that Wesley was there at the time. Plaintiffs also assert that Deputy Casal can be held liable for his participation in the plan that resulted in Deputy Pardinas going around to the back of the home.[11]

Plaintiffs bear the burden of demonstrating that Deputy Pardinas is not entitled to qualified immunity for her alleged search of the curtilage. To do so, Plaintiffs must show, based on the facts most favorable to Deputy Pardinas, that her entry into the backyard was a clearly established violation.

Deputy Pardinas testified, "I went to the back to prevent escape of the warrant suspect. This was a matter of standard protocol." (Pardinas Decl. ¶ 6.) Case law demonstrates that this arrest warrant protocol may be somewhat standard. *See,*

---

11. The claim against Deputy Pardinas is analyzed first, because if no violation occurred, then Deputy Casal cannot be liable, either.

*e.g., Carter v. State*, 308 Ga.App. 686, 708 S.E.2d 595, 597 (2011) (describing testimony from a police officer that "it was 'routine' for one officer to go to the rear of a house to secure it and prevent 'flight' "); *Young v. City of Radcliff*, 561 F.Supp.2d 767, 783 (W.D.Ky.2008) (finding curtilage violation where officers went around to the back of the home to "merely observ[e] to see if anyone exited the rear of the residence"). But "[a] longstanding, widespread practice is not immune from constitutional scrutiny." *Payton*, 445 U.S. at 600, 100 S.Ct. 1371.

■ The facts construed in the light most favorable to Deputy Pardinas show that, before she went into the backyard, she had before her the warrant packet that Deputy Casal put together. (Pardinas Dep. at 84–86.) This packet included the arrest warrant and the Gwinnett County Jail Booking Sheet from four months prior including an address for Wesley Brand at 4179 Valley Brook Road. (Pardinas Dep. at 84–86.) Four months is not long enough to make home address data so stale as to be unreliable, at least when the address listed is a house. That is so because "[r]esidency in a house ... generally is not transitory or ephemeral, but instead endures for some length of time." *Bervaldi*, 226 F.3d at 1265 (finding reasonable belief of residency based on a six-month old address). And although Deputy Casal testified that he did not "know" that Wesley lived at the residence until he walked up to the door and spoke with Ms. Velazco and Mrs. Brand, Deputy Pardinas made no such statement.[12] It is also unclear whether she went around back prior to Officer

Casal finding out that the vehicle in the driveway was registered to Mr. Brand. Based on these facts and drawing all reasonable inferences in Deputy Pardinas's favor, a jury could conclude that Deputy Pardinas had reason to believe that Wesley lived at 4179 Valley Brook Road. *See also United States v. De Parias*, 805 F.2d 1447, 1457 (11th Cir.1986) (affirming reasonable belief that suspect lived at residence where officers received information from a single source: an apartment manager) *overruled on other grounds by United States v. Kaplan*, 171 F.3d 1351 (11th Cir.1999).

A reasonable jury could also conclude that Deputy Pardinas had reason to believe that Wesley was at the address at the time she went around to the backyard. To start, the warrant was executed around 11:00 PM on a Monday night, and "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta*, 44 F.3d at 1533. If officers may presume a person is at home at 6:00 AM, *Bervaldi*, 226 F.3d at 1267, they are just as entitled to presume a person is at home at 11:00 PM.

In addition, a vehicle was parked in the driveway during the incident. (Tam. Brand Dep. at 119:1–3; Velazco Dep. at 20:23–21:2.) If Deputy Pardinas did not know the vehicle was registered to someone with the last name "Brand," the fact that a vehicle was "parked at the residence only buttresses the belief that persons were at the house, including presumably [Wesley]." *Bervaldi*, 226 F.3d at 1267.

12. In addition to the fact that Deputy Pardinas never made such a statement, the Court could reasonably infer from Deputy Casal's testimony that he meant only that he did not know for sure that Wesley Brand lived at the address. The Court addresses this issue in the section below concerning Deputy Casal's entry into the home.

And if she did know the vehicle in the driveway was registered to a Brand, a reasonable jury could infer that such knowledge would add to the reasonableness of a belief that a person with the last name Brand—*i.e.,* Wesley—was present at the time.

Accordingly, a reasonable jury could find that the facts, construed in Deputy Pardinas's favor, show that she had reason to believe Wesley lived at the residence and reason to believe he was there at the time. She also had a warrant for his arrest. Under *Payton* and its Eleventh Circuit progeny, a reasonable jury could conclude that Deputy Pardinas had the authority to enter the home to effect an arrest warrant. To the extent the backyard was curtilage, which the Court does not reach, she would then have had the authority to enter that, too. And because a jury could conclude, on the facts so construed, that Deputy Pardinas's going around to the rear of the Brands' home did not result in a Fourth Amendment violation, a jury could find that Deputy Casal is not liable for any participation in that plan. Plaintiffs' Motion for Summary Judgment is therefore **DENIED** on the claim that Deputy Pardinas's entry into the backyard violated the Fourth Amendment.

### D. Deputy Casal's entry through the front door without a search warrant

▮ Plaintiffs allege Deputy Casal also unlawfully entered their home. According to Plaintiffs, Deputy Casal's entry occurred when Mrs. Brand opened the door to speak with him and he put his foot across the threshold, blocking the front door from closing. Deputy Casal argues he was entitled to enter the home under *Payton* and its Eleventh Circuit progeny,

*Magluta* and *Bervaldi,* though he testifies he did not enter until later, when Mrs. Brand tried to slam the door on him.

"[A]ny physical invasion of the structure of the home, by even a fraction of an inch, is too much." *Moore v. Pederson,* —— F.3d ——, No, 14–14201 at 11 (11th Cir. Sept. 16, 2015) (punctuation omitted) (quoting *Kyllo v. United States,* 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). Deputy Casal's entrance into the home does not violate the Fourth Amendment if "the facts and circumstances within" his knowledge "warrant a reasonable belief [1] that the location to be searched is the suspect's dwelling, and [2] that the suspect is within the residence at the time of entry." *Magluta,* 44 F.3d at 1533. On Plaintiffs' Motion, the Court accepts Defendant Deputy Casal's version of the facts as true and draws all reasonable inferences in his favor.

The analysis for Deputy Casal entering the front door is substantially similar to the above analysis for Deputy Pardinas. The following asserted facts, which were already accepted in the light most favorable to Defendants in the above analysis, apply equally to Deputy Casal's reasonable belief of Wesley's residence and presence:

1. Deputy Casal relied on an address for Wesley that was four months old.

2. The arrest warrant was served at 11:00 PM on a Monday.

3. There was a vehicle in the driveway of the residence that was registered to Mr. Brand.

Then there are additional facts that related to the question of the reasonableness of Deputy Casal's belief regarding his entry into the home. First, Deputy Casal testified as follows about his belief prior to encountering anyone at the residence:

Q. Okay. When you went to the house on February the 7th, 2011, did you know that Wesley Brand lived at that address?

A. No, I didn't.

(Casal Dep. at 19:7–10). Plaintiffs consider this statement the beginning and the end of the question of Casal's reasonable belief as to Wesley Brand's residence upon his entry into the home. But a reasonable jury could infer from Deputy Casal's testimony that he meant only that he did not know for sure that Wesley Brand lived at the address. Whatever a jury makes of that statement, according to Casal, he did not enter the home at that point, prior to obtaining sufficient acceptable confirmation of Wesley's presence in the home. Resolving all factual disputes in Deputy Casal's favor, he approached the front door and encountered Ms. Velazco. Deputy Casal asked for Wesley, and Ms. Velazco responded, "Well, I would like to go in and get his parents, because he [is] a minor [.]" (Trial Transcript, Doc. 75–4 at 6–7.) Ms. Velazco went inside and shut the door.

Soon after, both parents appeared at the door. (Casal Incident Report.) According to Deputy Casal's testimony, he did not enter the home at this point, either. Deputy Casal identified himself, explained why he was there, and asked where Wesley was. (Id.) Mrs. Brand said she did not know where Wesley was, but she expected him "home" the next day. (Casal Incident Report; Casal Dep. at 23:24–25.)

While Deputy Casal was talking to the Brands and showing them the information on the arrest warrant, Deputy Pardinas announced over the radio, that she had a positive identification on the wanted subject in the back room. (Casal Incident Report; 911 Dispatcher Audio Tape ("Are you aware that there is another adult that possibly matches our description in the house?").) It was only at this time, according to Deputy Casal, that he entered the home.

By that point, the facts and circumstances known by Deputy Casal supported a reasonable belief that it was Wesley's residence. In support of this belief, he had the Booking Sheet address from four months earlier. He had Ms. Velazco's statement that Wesley was a minor and that his parents lived there. An officer can reasonably believe that a minor lives with his parents, and a jury could reasonably infer that Deputy Casal, by that point in time, believed that Wesley was a minor, despite typos on the arrest warrant and Booking Sheet.

If Officer Casal harbored any confusion, Wesley's parents opened the door and indicated that this was Wesley's "home." Deputy Casal then showed them the warrant with the attached photograph of Wesley and they did then deny that he was their son. Finally, Casal's entry was also in response to his partner's statement that she had observed a suspect matching Wesley Brand's description inside the house. On the facts in this light, a reasonable jury could find that Deputy Casal had a reasonable basis to believe he was entering Wesley Brand's residence.

The evidence construed in the light most favorable to Defendants also supports a finding that Deputy Casal had reason to believe that Wesley was at home at the time. When the Deputies arrived at 4179 Valley Brook Road, it was 11:00 PM and there was a vehicle in the driveway. These circumstances indicate indicia of Wesley's presence, as discussed earlier. *See Bervaldi*, 226 F.3d at 1267. In addi-

tion, when Ms. Velazco was approached, she did not say that Wesley was not home, but she did say he was a minor and that she would go get his parents.

Finally, Deputy Casal relied on Deputy Pardinas's eyewitness account that an adult possibly matching Wesley's description was in the house. On Deputy Casal's best facts, a jury could conclude that he had a reasonable belief that 4179 Valley Brook Road was Wesley's residence and a reasonable belief that Wesley was home at the time. Thus, Plaintiff's Motion must also be **DENIED** on the claim that Deputy Casal illegally entered the home.

### E. Both Deputies' performance of a protective sweep

■■■ Plaintiffs claim that Defendants are liable for a protective sweep that was not justified, quick, or limited. Defendants argue that they, personally, only performed a search incident to Wesley and Mrs. Brand's arrests. They also argue that even if the other officers at the scene performed a protective sweep, it was not under their supervision and was justified at any rate.

According to Deputies Casal and Pardinas, each entered some of the rooms and stairways adjacent to the foyer. On the facts as construed on this Motion, the Court finds that Defendants likely performed a protective sweep, not a search incident to arrest. Even so, a reasonable jury could conclude that the protective sweep as performed by these officers was reasonable. A reasonable jury could also find that neither Defendant is liable for the acts of other officers, as discussed below.

■■■ "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie,* 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327, 110 S.Ct. 1093.

■■■ Incident to an arrest, the officers, as a precautionary measure, may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion. *Id.* at 334, 110 S.Ct. 1093. Beyond this limited search, the protective sweep is constrained by the following requirements. *Id.* at 334–36, 110 S.Ct. 1093. *First,* the sweep may occur only when "the searching officer 'possesse[s] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing' ... that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 334, 110 S.Ct. 1093 (quoting *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). *Second,* the sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. *Third,* "[t]he sweep [may] last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093.

The evidence construed in Defendants' favor on Plaintiffs' Motion shows that the

situation at 4179 Valley Brook Road was both volatile and hostile. The Deputies encountered violence upon entry, with multiple individuals refusing to comply with orders to stay back and sit down. The suspect's mother attempted to flee and was tased. After she was tased, the situation became "fairly chaotic," with multiple individuals "screaming." (Tam. Brand Dep. at 166:3–16.) Mr. Brand started "freaking" after his wife was tased. (Theo Brand Dep. at 66:16.) Individuals known and unknown were walking around the foyer "in a combative manner." (Pardinas Use of Force Report at 31.) Ms. Velazco or some other person was upstairs and refused to come down despite Deputy Pardinas's orders. (Pardinas Dep. at 100:1–11.)

All of these events occurred in the foyer of a split-level home with four levels, and the foyer appears to have immediate access to at least three of the levels. (Tam. Brand Dep. at 119:15–120:20.) Both ascending and descending staircases empty into the foyer. The foyer was, on the evidence before the Court, quite the epicenter of uncertainty.

■ Construing this evidence most favorably to Defendants, a reasonable jury most certainly could conclude that the Deputies had "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer[s] in believing . . . that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093 (quotation omitted). "Law enforcement officers who have lawfully apprehended a suspect on a portion of a structure . . . which they have reason to believe contains dangerous third persons who might pose a threat to their safety have a right to con-

duct a reasonable security check of such premises." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir.1983); *see also United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir.1991) (en banc) (holding protective sweep of entire home lawful where multiple cars were parked in the driveway, the suspect lied to officers at the front door that no one else was in the home, another person then came to the door, and the suspect was eventually arrested in the garage).

Deputies Pardinas and Casal were executing a felony arrest and, according to their testimony, they encountered violent resistance upon entry into the home. The Deputies also knew that at least one person was upstairs and refusing to obey law enforcement commands to come downstairs. Under *Buie* and *Tobin*, a reasonable jury could find that these specific and articulable facts justified the protective sweep.

Plaintiffs rely on *United States v. Chaves*, 169 F.3d 687 (11th Cir.1999), as clearly establishing Defendants' Fourth Amendment violation. In that case, the court found unlawful the protective sweep of a warehouse 45 minutes after the defendants were arrested outside, on the grounds that the government failed to show an immediate need to enter the warehouse to protect themselves or other persons in the area, given the delay. The officers in *Chaves* had "no information regarding the inside of the warehouse"— indeed, they had been sitting in their cars right outside the warehouse for the entire 45 minutes—so the court found they did not have "specific and articulable" facts that would lead a reasonably prudent officer to believe a sweep was *immediately* necessary for protective purposes. *Id.* at 692. Those very different facts in

*Chaves*—including an outside arrest, lack of knowledge of the contents inside the warehouse, and a 45-minute delay between the arrest and the search—likely would not put a reasonable officer on notice that a protective sweep of the Brands' home under the circumstances presented in *this* case and construed in Defendants' favor would be unlawful.

On the record before the Court, a jury could also find that the protective sweep did not exceed "cursory inspection of those spaces where a person" who might launch an attack might hide. *Buie,* 494 U.S. at 335, 110 S.Ct. 1093. At least three floors connect directly to the foyer, where the Deputies were waiting for an ambulance to show up and assess Mrs. Brand, and the Deputies themselves only searched the rooms adjacent to the foyer. As for the Deputies' comments to other officers that the upstairs and downstairs had not been cleared, a reasonable jury could find that those comments to other officers were not commands to search those areas of the house, but simply accurate descriptions of the circumstances.

▮▮▮▮ A reasonable jury could also infer that Deputy Casal's comments that he "directed [officers] to certain places," (Casal Dep. at 25:1–3), and that he was the "primary officer" that night do not require the result that he was the cause of any unlawful searches that occurred. "A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota Cnty., Fla.,* 419 F.3d 1160, 1165 (11th Cir.2005). "[I]t is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Swint v. City of Wadley, Ala.,* 51

F.3d 988, 999 (11th Cir.1995) (quotation omitted).

In *Jackson v. Cosby,* this court held that a reasonable jury might conclude an officer caused an unlawful entry into a home where "[a]ll evidence in the record indicate[d] that that [officers] commenced their search of Plaintiff's home only after Defendant Cosby indicated to them that he had obtained Plaintiff's consent" and instructed them that they could search the home. No. 1:12–cv–4447–AT, Doc. 60 at 16 (N.D.Ga. Sept. 5, 2014). A reasonable jury, presented with the evidence in the light most favorable to Deputy Casal, could find that he did not direct any unlawful search that may have occurred—but also might reach the opposite conclusion.

Lastly, a jury could also find that a sweep that lasts a "matter of minutes" does not offend the third prong of *Buie.* The Brands' house comprised four levels and multiple bedrooms. A reasonable jury could conclude that a protective sweep lasting a few minutes under the circumstances presented here is not a Fourth Amendment violation. *See United States v. Delgado,* 903 F.2d 1495, 1502 (11th Cir. 1990) (holding protective sweep "clearly valid under *Buie* " where the sweep of a warehouse lasted no more than 3 to 5 minutes); *see also United States v. Sunkett,* 95 F.Supp.2d 1367, 1369 (N.D.Ga.2000) ("The sweep [of the apartment] conducted by the officers was brief, lasting only a few minutes."); *U.S. v. Henderson,* 748 F.3d 788, 791–93 (7th Cir.2014) (finding protective sweep of home valid because, among other things, it lasted 5 minutes). Accordingly, Plaintiff's motion is **DENIED** on the protective sweep count.

### F. Both Deputies's purported failure to cover up Mrs. Brand after ripping her shirt

▮▮▮▮ Lastly, Plaintiff Mrs. Brand seeks summary judgment on the claim that Dep-

uty Casal ripped Mrs. Brand's shirt and that both Deputies, despite numerous requests for sufficient covering, left her exposed such that both of her breasts were visible through her bra. (Affidavit of Tamara Brand ¶¶ 2–3, Doc. 29–3.) These facts are directly contradicted by Defendants. Defendant Pardinas testified at her deposition that she rearranged Mrs. Brand's shirt "to cover her as much as possible." (Pardinas Dep. at 98:4–5.) Deputy Pardinas submitted a subsequent declaration clarifying that she had "no recollection of Mrs. Brand having asked me or any other officer for additional clothing. Mrs. Brand's shirt could be, and was, arranged to cover Mrs. Brand's upper body without revealing her breast(s)." (Pardinas Decl. ¶ 10.) Deputy Casal does not remember much about the shirt situation, but he does remember that he "didn't get [Mrs. Brand] a T-shirt," (Casal Dep. at 65:20), and that she was "covered up when she got to the jail." (*Id.* at 66:5–7.)

Plaintiffs argue that *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds*, *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) clearly establishes that what Defendants did in this case was unlawful. In *Monroe v. Pape*, though, the facts were drastically different:

> [T]hirteen Chicago police officers, led by Deputy Chief of Detectives Pape, broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room.

*Id.* at 203, 81 S.Ct. 473 (Frankfurter, J., dissenting.) *Monroe v. Pape* and the other cases relied upon by Plaintiffs all involve officers who forced individuals to remain nude or partially nude, and some involve forcing individuals to exit their homes while nude or partially nude. *See*, *e.g.*, *Hall v. Shipley*, 932 F.2d 1147 (6th Cir.1991) (individuals forced to stand and sit nude in living room in cold January air for 20–30 minutes); *Mitchell v. Stewart*, 26 F.Supp.3d 1322 (M.D.Ga.2014) (male and female forced to remain partially nude, with exposed genitalia, even when they got to jail); *Luster v. Ledbetter*, 647 F.Supp.2d 1303, 1308–09 (M.D.Ala.2009) (wife handcuffed and forced to walk nude out to the patrol car).

At this stage, the Court must accept non-movant Defendants' evidence as true and draw all reasonable inferences in their favor. When the evidence is viewed in this light, Mrs. Brand was not exposed. Her shirt, while ripped, was arranged to cover her private areas. As there is a material dispute of fact as to whether she was forced to sit or stand nude or partially nude, her request for summary judgment is **DENIED** on this claim.

## IV. CONCLUSION

The record in this case includes a hot mess of factual disputes that undoubtedly will affect the Court's consideration of Defendant's motion for summary judgment as well. When ruling on Plaintiffs' motion for partial summary judgment, the Court was required to view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097. After doing so, it is clear that Plaintiffs' Motion for Partial Summary Judgment [Doc. 29] must be **DENIED**.